FILED

02/28/2017

Clerk of the
Appellate Courts



IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs December 20, 2016

## RACHEL L. CALHOUN v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Sullivan County**
No. C64920  R. Jerry Beck, Judge

_____

### No. E2016-00858-CCA-R3-PC

_____

The Petitioner, Rachel L. Calhoun, appeals the denial of her petition for post-conviction relief in which she challenged her guilty pleas to two counts of first degree murder, one count of especially aggravated robbery, one count of identity theft, and one count of fraudulent use of a credit card and her effective life sentence.  On appeal, the Petitioner contends that she was denied her right to the effective assistance of counsel, arguing that trial counsel should have independently tested palm print evidence used against her.  She also argues that her pleas were unknowing and involuntary.   We affirm the post-conviction court's denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and JAMES CURWOOD WITT, JR., J., joined.

David S. Barnette Jr., Kingsport, Tennessee, for the appellant, Rachel L. Calhoun.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Barry P. Staubus, District Attorney General; and Joshua D. Parsons, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTUAL AND PROCEDURAL HISTORY

The Petitioner pled guilty to first degree premeditated murder, felony murder during the perpetration of a robbery, especially aggravated robbery, identity theft, and

fraudulent use of a credit card. Pursuant to the guilty plea agreement, the trial court sentenced the Petitioner to life in prison for each murder conviction, twenty-five years for the especially aggravated robbery conviction, two years for the identity theft conviction, and eleven months and twenty-nine days for the fraudulent use of a credit card conviction. The trial court merged the murder convictions and ordered all the sentences to be served concurrently for an effective sentence of life imprisonment.

## Guilty Plea Submission Hearing

The relevant facts underlying the Petitioner's guilty plea were stipulated to at the guilty plea submission hearing as follows:

> On February the 6th, 2011, Sullivan County Sheriff's Department responded to the address of 1092 Reedy Creek Road, Bristol, Sullivan County, Tennessee. A 9-1-1 call had come in that a gentleman later to be identified as Johnny Shankel was in his residence and was possibly dead.
>
> Once law enforcement were able to get into the home, they were able to confirm that there was a deceased individual in the home.
>
> The body was sent to the Quillen College of Medicine, Forensic Center, to have an autopsy completed. The result of that autopsy listed manner of death as homicide, and the cause of death to be ligature strangulation, marks around the neck, and multiple impacts of blunt force trauma.
>
> During the course of the investigation law enforcement began to develop Rachel Lynn Calhoun as a possible suspect, as she and her co-defendant, Willie Mack Coleman, were neighbors.
>
> ….
>
> Multiple statements were taken from Ms. Calhoun and Mr. Coleman over the course of essentially a two-day period from February the 6th, 2011, to the early morning hours of February the 8th, 2011. During the course of that investigation they were able to determine by way of statement that Ms. Calhoun had gone to the residence of Mr. Shankel; that she had hit him with a stick or wooden object of some kind multiple times; and had also strangled him with a piece of -- of cord or wiring that would be used as a dog lead, which was confirmed in the report from the Quillen College of Medicine that we have.

2

Also how Ms. Calhoun was developed as a suspect was that the credit card or a credit card belonging to Mr. Shankel was attempted to be used at Bristol Regional Medical Center, which is also in a location here in Sullivan County, Tennessee, to attempt to get money out of the ATM through his account.

In speaking with representatives from the BB&T Bank where the account was located, Ms. Calhoun was not a registered user on that account, and that she would have done so at the time without the permission of Mr. Shankel, without his permission to use his specific identifying information.

I've passed up as an exhibit to these facts, as collective Exhibit 1, the various statements in order, as well as the Miranda waivers that Ms. Calhoun gave over the course of a two-day period or two-and-a-half day period of this investigation, which were also the subject of a suppression hearing which we held before Your Honor earlier this year. I included only those statements that were not suppressed at the conclusion of that statement. And as Your Honor will note and as the record will note, Ms. Calhoun did admit to striking Mr. Calhoun multiple -- or Mr. Shankel multiple times.

….

I want to refer specifically to the last statement in order, in which Ms. Calhoun stated to Detective Bright,

> I hit Johnny … with a big stick. I pushed Johnny. I hit him with a stick. I meant to hit him. I used the dog cable to choke Johnny.

> Johnny started grabbing at me. I pushed him first. I pushed him down. I hit him with a stick about five or six times. I wanted to hit Johnny.

> After I hit -- after I hit, Johnny was calling me a bitch. I then grabbed the dog cable and wrapped it around his neck until he stopped breathing. I then took Johnny's money out of his wallet. It was around $20. After I took Johnny's money and credit card, I tossed the wallet out in the yard.

3

I wanted to kill Johnny for what he did to me.

I went back to the next -- to check on Johnny and call the police because no one needs to lay on the floor and rot. I'm sorry that I did it.

Some of the money that I took from Johnny, I spent it at CVS and Walmart. I told Willie that after I knocked out Johnny, I took the money and credit cards out of Johnny's wallet.

I think I got $400 out of the ATM at Food City. … Took the credit cards 'cause I wanted to pay off all my bills and get my own place. When Willie found out I was using the cards, Willie told me that I needed to cut the cards up before I got in trouble.

We would also reference other statements as listed as a part of the stipulation of fact.

In short, that Ms. Calhoun took Mr. Shankel's life with premeditation; did so with the intent to take money from him to pay off bills; used his identifying information without his permission; used his credit card without his permission; and used a deadly weapon, in this case a dog cable and a stick, on him during the commission of the robbery; and also did cause serious bodily injury. In this case that serious bodily injury was Mr. Shankel's death. And that would be the State's submission of facts in this case.

At the plea hearing, the Petitioner affirmed to the court that the stipulated facts were accurate and true; that she expected to plead guilty to first degree premeditated murder and felony murder during the perpetration of a robbery, to be merged; that she was not required to plead guilty; that she wanted to plead guilty pursuant to the agreement; that she did not "have any complaints against" trial counsel; that she was unaware of anything trial counsel should have done further to prepare in his representation; that she did, in fact, sign and understand the waiver of rights and plea agreement; that although she could not read due to poor eyesight, trial counsel read the waiver of rights and plea agreement to her; and that she did not have any questions about the waiver or agreement for the court. Accordingly, the trial court accepted the Petitioner's guilty plea.

## Post-Conviction Hearing

The Petitioner's petition for post-conviction relief alleged that her "[c]onviction was based on [an] unlawfully induced guilty plea or [a] guilty plea involuntarily entered without understanding of the nature and consequences of the plea" and that she was denied the "effective assistance of counsel." She asserted the following factual basis for her petition:

> Petitioner avers that counsel did not fully explain that the plea agreement. Petitioner avers that she was advised that she had to give a statement or she would face harsh consequences. Petitioner avers that she was advised by police detectives that she would be able to go home if she confessed. Petitioner avers that she was under the influence of several prescription medications such as Neurotin, Diylantin, Vistaril and Amb[ie]n along with recently smoking marijuana prior to being questioned. Petitioner avers that she takes several medications due to the fact that she suffers from seizures. Petitioner avers that she does not remember being read her Miranda rights. Petitioner avers that she requested presence of attorney but was not given one. Petitioner avers that only one of her statements was suppressed and the other four were not. Petitioner avers that she did receive a competency hearing that deemed that she was fit to stand trial however Petitioner avers that counsel did not seek a second opinion to this decision. Petitioner avers that during six hours of her questioning she was in the hospital and had been given a strong shot for pain management and was not completely lucid. Petitioner avers that counsel did not try to have her bond reduced even though nothing was said that she may or may not have been a flight risk. Petitioner avers that she would not have been a flight risk. Petitioner avers that her counsel knew the judge well on a personal level and felt that this was a conflict of interest. Petitioner further avers that attorney did not give any encouragement on this case and advised the Petitioner that the State would give her the death penalty. Petitioner avers that during the search of her home, her drains were taken apart and the only blood that was identified was canine blood as her dogs were in labor. Petitioner avers that police did not try to question anyone else only her. Petitioner avers that she went to the store for the victim often. Petitioner avers that a handprint that was located was tested and found to be inconclusive.

> Petitioner avers that her Fifth (5th) and Fourteenth (14th) Amendments were violated as she did not receive due process and was not protected from self incrimination.

Petitioner avers that her Sixth (6th) Amendment was violated as attorney did not zealously defend the Petitioner to protect her rights.

In her amended petition for post-conviction relief, the Petitioner again argued that her guilty plea was unknowing and involuntary. She alleged that she did not have the sufficient intellectual capacity, she was unfamiliar with the criminal justice system, she was not able to confer with trial counsel enough, "she did not understand the full consequences of her plea," and she thought the death penalty would be sought against her, which led her to plead guilty. The Petitioner also argued that counsel was ineffective by failing to obtain "additional independent expert" testing of the palm print evidence used by the State to place the Petitioner at the scene of the crime.

At the post-conviction hearing, trial counsel testified that he served as the Petitioner's appointed counsel for about three years. He said he appeared in court thirteen times, met with the Petitioner eleven times, and spoke on the telephone with the Petitioner eighteen times in relation to her case. He stated that although he could not recall specifically giving the Petitioner a copy of the discovery, he "always provided [his] clients with discovery." Trial counsel also stated that before the death penalty was taken "off the table," he informed the Petitioner that she could face the death penalty for the charges against her. He testified that the Petitioner was in the courtroom when the State announced that it would not seek the death penalty against the Petitioner.

Trial counsel testified that his initial trial strategy was to deny that the Petitioner was ever at the crime scene but that his strategy changed upon the discovery of a palm print that linked the Petitioner to the crime scene. Trial counsel stated that initially the State only had an "unidentifiable palm print," but then the State identified the palm print as belonging to the Petitioner about twenty-one months later. Trial counsel received the reports of the palm print findings from the Tennessee Bureau of Investigation. He stated that the palm print evidence "knocked the wind out of our sails and left us basically with an indefensible case…." Trial counsel testified that he consulted with an expert in palm print evidence over the telephone but did not provide the written reports to the expert. He stated that he asked the expert to serve as an expert witness for the Petitioner and "[the expert] related to [him] that unless there was some evidence that the evidence was collected improperly or tampered with, and unless [he] had something other than a hunch or a suspicion, that [the expert] didn't want to get involved and didn't know anyone else … that he could suggest." Trial counsel testified that although he was skeptical of the State's ability to identify the palm print, he did not believe his "hunch" was enough to support a request to the trial court to employ an expert witness in palm prints. He

confirmed that the palm print identification was the State's only physical evidence that tied the Petitioner to the crime scene.

Trial counsel testified that he learned that the Petitioner had Chiari-I malformation, which according to trial counsel's research "could impair a person's ability cognitively." As a result, he sought, and the trial court approved, funding for two medical experts: an otolaryngologist,[1] Dr. David Francis Street, and a neuropsychologist, Dr. James S. Walker. Trial counsel testified that the experts "quickly dispelled" the idea that the Petitioner had a defense based upon her mental condition. He also testified that the Petitioner's medial history was "pretty extensive." Trial counsel stated that although the Petitioner "had two medical visitations to Holston Valley Hospital the day of her last two statements," he did not believe he brought that fact to the attention of the experts who reviewed the Petitioner's medical history. He admitted that he was aware that the Petitioner was taking prescribed, narcotic medications. He stated that of the five statements that the Petitioner gave to police, the last two statements were, in fact, the "most probative" and "[d]amning statements." Trial counsel characterized the Petitioner's I.Q. as "well above 70," although he could not recall how he came to that conclusion. In a Report of Trial Judge in First Degree Murder Cases, which was admitted during trial counsel's testimony, the trial judge found that the Petitioner's I.Q. was between 70 and 100 points.

On cross-examination, trial counsel testified that the Petitioner was in the courtroom when the announcement was made to the trial court by the State that it would not pursue the death penalty. He stated that he informed the Petitioner of the potential punishments and lengths of sentences she faced, including life and life without parole. He testified that after the announcement to not seek the death penalty, he never told nor led the Petitioner to believe that she still faced the threat of a death sentence. Trial counsel also testified that the Petitioner never indicated to him that she did not understand the court system or the seriousness of the charges. He stated that he reviewed possible defenses with the Petitioner in preparation of a possible trial, noting that there was no possible defense after the palm print evidence surfaced. Trial counsel testified that he "went over all the rights and information contained in" the waiver of rights that the Petitioner signed. He also testified that the Petitioner never indicated "a concern that she did not know what was going on [the day of the guilty plea submission hearing]" or any "type of medical distress or situation in which she couldn't go on with her plea." Trial counsel stated that he "physically review[ed]" the palm print evidence that the State disclosed to the Petitioner. He also stated that based upon his review of the evidence, there was no reason to believe that someone had tampered with the evidence.

---

[1] Trial counsel also briefly refers to Dr. Street as a forensic psychiatrist.

7

On re-direct examination, trial counsel testified that after receiving a letter from the Petitioner where she complained that trial counsel lacked faith in her case, did not give her case adequate attention, and did not explain the nature and seriousness of the charges against her, trial counsel visited with the Petitioner five times to prepare for trial, noting that he "had plenty of faith in her case." He stated that he did not believe that the Petitioner was unaware of the severity of the charges against her, asserting that he discussed them with her.

The Petitioner testified that she was "led to believe that [she] was going to get the death penalty no matter what," and that trial counsel confirmed her belief. She denied knowing about the State's announcement that it would not pursue the death penalty, despite being in court at the time of the announcement. She stated that she received a copy of her discovery and that trial counsel reviewed the information with her. She also stated that although she discussed her statements with trial counsel, they did not go "into detail about the trial." The Petitioner testified that at their last meeting, they discussed the newly revealed palm print match and she asked why the palm print did not match earlier. She also testified that trial counsel informed her that he received a second opinion regarding the palm print evidence.

The Petitioner stated that she graduated from high school, had not been previously charged with a felony, and remained in jail for about three-and-a-half years before accepting her plea. She acknowledged that she knew that she had the opportunity to go to trial instead of accepting a plea. She testified that in discussing possible outcomes of a guilty verdict at trial, trial counsel informed her that life without parole would be the only sentence she could face and did not inform her of possible lesser-included offenses. She also testified that she read over the guilty plea offer as "best [she] could" and that trial counsel visited her to explain the offer to her. The Petitioner stated that trial counsel told her "[t]hat the State could still seek the death penalty" and that she would have proceeded to trial if she was aware that the State was not, in fact, seeking the death penalty.

The Petitioner denied knowing whether she went to the hospital on the night of a suppression hearing, stating that she was too intoxicated on drugs to remember. She testified that when she gave her first statements to police, she was on narcotics and advised trial counsel and the medical experts that she was on narcotics. She also testified that she suffers from bipolar disorder, post-traumatic stress disorder, seizures, high blood pressure, and headaches that cause her to have memory issues.

On cross-examination, the Petitioner conceded that on the day of the guilty plea submission hearing, the trial judge informed her that she would be sentenced to life in prison. She also conceded that she told the trial judge that she expected to be sentenced to life in prison. She testified that the trial judge informed her of the possible sentences

8

resulting from a guilty verdict at trial. She also testified that she did not understand that her sentence would be a life sentence and admitted that she did not inform the trial judge that she did not understand what her sentence would be. The Petitioner conceded that she told the trial judge that she did not have any questions or complaints regarding her plea or sentence. She testified that despite her medical condition, she understood what was "going on" at her suppression hearing and guilty plea submission hearing, explaining that she "wasn't under the influence of drugs then." She admitted that prior to the day that she pled guilty, she had "been through the criminal justice system in Ohio" and was aware of the roles of judges and attorneys. The Petitioner acknowledged that she had completed two years of college education. Although the Petitioner stated that she was present when the State announced that it would not pursue the death penalty, she "was still under the assumption they were going to seek the death penalty." She testified that she was "scared to tell the [trial court] that [she] had concerns" with trial counsel's representation.

In its order denying the petition for post-conviction relief, the post-conviction court found that the Petitioner's statements and confessions to the police "were freely given," stating that "the officers saw no sign of intoxication or that the [Petitioner] was under stress." The post-conviction court also found that the Petitioner failed to "describe any prejudice she suffered due to lack of visitations" by trial counsel, noting that trial counsel "met with her in jail eleven times, had eighteen phone conversations with her from the jail and met with her in the context of thirteen court appearances." In regard to trial counsel's communication with the Petitioner, the post-conviction court found that the Petitioner gave conflicting statements on the matter and that trial counsel asserted that he was diligent about reviewing discovery with clients. In regard to a potential mental capacity defense, the post-conviction court found that trial counsel obtained experts who "could not develop a mental defense," that the Petitioner had an I.Q. between 70 and 100, and that she had two years of college education.[2] The post-conviction court also found that trial counsel sought an expert in the field of latent palm prints identification who refused to testify on behalf of the Petitioner.

The post-conviction court also found that although the Petitioner claimed she thought she would face the death penalty at trial, the record revealed that the Petitioner was on notice of the State's decision to not pursue the death penalty and to instead seek a sentence of life without parole. Similarly, the post-conviction court found that although

---

[2] We note that the record does not support the post-conviction court's statement in its denial of the mental capacity issue that the Petitioner's I.Q. was between 50 and 100. We assume that this statement was a typographical error because the post-conviction court's factual findings state that her I.Q. was between 70 and 100, trial counsel testified that her I.Q. was "well above 70," and the report supplied to the trial court stated that her I.Q. was between 70 and 100.

the Petitioner claimed she did not comprehend her guilty plea agreement, the record revealed that the Petitioner testified at the plea colloquy that she understood the agreement and that the trial court properly conducted the plea colloquy. The post-conviction court also found that although the petitioner could not recall whether trial counsel discussed lesser-included offenses with her, trial counsel testified that he did, in fact, discuss the matter of lesser-included offenses with the Petitioner. Ultimately, the post-conviction court found the Petitioner's testimony to not be credible and trial counsel to be credible, concluding that the Petitioner failed to meet her burden in establishing that she is entitled to post-conviction relief.

## ANALYSIS

On appeal, the Petitioner argues that because she received the ineffective assistance of counsel, her plea was unknowingly and involuntarily entered. The Petitioner contends that trial counsel failed to properly advise her that she could not be sentenced to death if she proceeded to trial and that trial counsel should have obtained independent testing of the incriminating palm print evidence. The State argues that trial counsel's representation of the Petitioner was effective and that her guilty plea was, in fact, knowing and voluntary.

To obtain post-conviction relief, a petitioner must prove that his or her conviction or sentence is void or voidable because of the abridgement of a right guaranteed by the United States Constitution or the Tennessee Constitution. T.C.A. § 40-30-103; *Howell v. State*, 151 S.W.3d 450, 460 (Tenn. 2004). A post-conviction petitioner must prove allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); *Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). In an appeal of a court's decision resolving a petition for post-conviction relief, the court's findings of fact "will not be disturbed unless the evidence contained in the record preponderates against them." *Frazier v. State*, 303 S.W.3d 674, 679 (Tenn. 2010).

## I.     Ineffective Assistance of Counsel

A criminal petitioner has a right to "reasonably effective" assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). The right to effective assistance of counsel is inherent in these provisions. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984); *Dellinger*, 279 S.W.3d at 293. To prove

ineffective assistance of counsel, a petitioner must prove both deficient performance and prejudice to the defense. *Strickland*, 466 U.S. at 687. Failure to satisfy either prong results in the denial of relief. *Id.* at 697.

For deficient performance, the petitioner must show that "counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms, despite a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 688-89. "In other words, the services rendered or the advice given must have been below 'the range of competence demanded of attorneys in criminal cases.'" *Grindstaff*, 297 S.W.3d at 216 (quoting *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The petitioner must prove that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. When reviewing trial counsel's performance for deficiency, this court has held that a "petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). The reviewing court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689). However, "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

"'[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" *Burns*, 6 S.W.3d at 462 (quoting *Strickland*, 466 U.S. at 691). "[W]hen a petitioner has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691. "Counsel must conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed." *Baxter*, 523 S.W.2d at 933.

Prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In *Strickland*, the Supreme Court noted that "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. The Court clarified that prejudice "requires showing that counsel's errors were so serious as

11

to deprive the petitioner of a fair trial, a trial whose result is reliable." *Id.* at 687. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

A claim of ineffective assistance of counsel raises a mixed question of law and fact. *Burns*, 6 S.W.3d at 461; *Grindstaff*, 297 S.W.3d at 216. Consequently, this court reviews the trial court's factual findings de novo with a presumption of correctness, unless the evidence preponderates against the trial court's factual findings. *Grindstaff*, 297 S.W.3d at 216. However, the trial court's conclusions of law on the claim are reviewed under a purely de novo standard with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

The Petitioner argues that trial counsel was deficient for not obtaining independent testing of the incriminating palm print evidence. She argues that because the palm print testing was initially inconclusive, trial counsel should have concluded that the subsequent palm print match warranted an independent investigation. After the palm print match was discovered, trial counsel consulted with a palm print expert who informed him that trial counsel would need more than just a "suspicion or hunch" for the expert or any other expert to be willing to question the veracity of the palm print evidence provided by the Tennessee Bureau of Investigation. Trial counsel testified that he did not have more than a suspicion that something could be wrong with the match. "The Constitution does not require attorneys to 'shop around' for more favorable expert testimony." *Jon Hall v. State*, No. W2003-00669-CCA-R3-PD, 2005 WL 22951, at *34 (Tenn. Crim. App. Jan. 5, 2005) (quoting *Poyner v. Murray,* 964 F.2d 1404, 1419 (4th Cir.1992)). Accordingly, we hold that trial counsel was not deficient for failing to obtain independent testing of the palm print match.

Further, even if trial counsel was deficient, the Petitioner has failed to carry her burden to establish prejudice. In the context of a guilty plea, to satisfy the second prong of *Strickland,* the petitioner must show that "there is a reasonable probability that, but for counsel's errors, [she] would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59; *see also Walton v. State*, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997). The Petitioner did not introduce any evidence that showed what independent testing would have revealed and, thus, failed to show how that evidence would have changed her decision to plea guilty.

The Petitioner also argues that trial counsel was ineffective for failing to inform her that she could not be sentenced to death if convicted at trial. She contends that if she knew that she could not be sentenced to death, she would not have pled guilty. Here, the post-conviction court found that the Petitioner was on notice of the State's decision to not pursue the death penalty. The post-conviction court also credited the testimony of trial

12

counsel who testified that he never led the Petitioner to believe she could be sentenced to death after the State announced that it would not seek the death penalty. Accordingly, we hold that trial counsel was not deficient because he informed the Petitioner that she could not be sentenced to death. We, therefore, need not reach the issue of prejudice on this issue.

## II. Voluntariness of the Guilty Plea

In evaluating the knowing and voluntary nature of a guilty plea, the United States Supreme Court has held that "[t]he standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Alford*, 400 U.S. at 31 (citations omitted). In making this determination, the reviewing court must look to the totality of the circumstances. *State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995); *see Chamberlain v. State*, 815 S.W.2d 534, 542 (Tenn. Crim. App. 1990). Indeed,

> a court charged with determining whether ... pleas were "voluntary" and "intelligent" must look to various circumstantial factors, such as the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

*Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993) (citation omitted).

The Petitioner argues that upon examination of the *Blankenship* factors, the trial court should not have found that she had knowingly and intelligently entered her guilty plea. *Id.* The Petitioner states that the first *Blankenship* factor, the relative intelligence of the petitioner, is "neutral in probabtive value." The post-conviction court, however, found that trial counsel was unable to obtain experts to support a mental health defense. Trial counsel had the Petitioner evaluated by two medical experts, neither of whom were able to conclude that a mental health defense could be available at trial. The post-conviction court also found in its summary of the testimony that the Petitioner had an I.Q. between 70 and 100, had a high school education, and obtained two years of college education. We hold that this factor weighs against the Petitioner.

Second, the Petitioner argues that the "Petitioner had little to no experience with serious criminal matter proceedings and that factor should weigh in her favor." The Petitioner testified, however, that she was familiar with the roles of lawyers and judges

because she had been involved as a defendant in the criminal justice system of another state. We hold that this factor weighs against the Petitioner.

Third, the Petitioner contends that she was was not "represented by competent counsel" and did not have "the opportunity to confer with counsel about the options available to [her]." *Blankenship*, 858 S.W.2d at 904. While charges were pending against her, the Petitioner wrote a letter to trial counsel alleging that she was confused about the charges against her, was unable to reach trial counsel, and did not feel confident in trial counsel's representation. The post-conviction court, however, found that trial counsel "met with her in jail eleven times, had eighteen phone conversations with her from the jail and met with her in the context of thirteen court appearances." Further, trial counsel testified that he diligently reviews discovery with each of his clients. We hold that this factor weighs against the Petitioner.

The fourth *Blankenship* factor, "the extent of advice from counsel and the court concerning the charges against [her]," also does not weigh in the Petitioner's favor. *Id.* Although the Petitioner testified that she did not fully comprehend the guilty plea agreement, trial counsel testified that he explained to the Petitioner the charges against her, the possible lesser-included convictions she could face, and the State's decision to drop the death penalty. Further, the trial court discussed the nature of the charges against her during its plea colloquy. We hold that this factor weighs against the Petitioner.

Finally, we must examine "the reasons for [her] decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial." *Id.* The Petitioner's guilty plea agreement called for a life sentence. Although the Petitioner testified that she does not remember, the Petitioner was present for the hearing when the State announced to the trial court that it would not seek the death penalty against the Petitioner. The State also filed a "Notice of State's Intention to Seek Punishment of Life Without the Possibility of Parole," which the Petitioner received. Trial counsel testified that after the State's decision to drop the death penalty, he never did anything to lead the Petitioner to believe that she could be sentenced to death following a jury trial conviction. She now argues that if she had known that the State did not wish to pursue the death penalty, she would not have pled guilty. The Petitioner faced a strong incentive to proffer her guilty plea because she was facing a sentence of a life without the possibility of parole sentence if she were convicted at trial. We hold that this factor weighs against the Petitioner.

The Petitioner also argues that "she was afraid to speak up about [her] reservations" regarding trial counsel's representation. We note, however, that the post-conviction court ultimately found the Petitioner's claims to not be credible, while finding that trial counsel provided effective assistance of counsel.

14

The Petitioner was present at the hearing where the State announced it would not seek the death penalty, she received notice that the State would seek life without the possibility of parole, and trial counsel and the trial court fully informed her of the sentences she would face if she proceeded to trial. Accordingly, we hold that the Petitioner's guilty plea was knowingly and intelligently entered.

## CONCLUSION

Based on the foregoing analysis, we affirm the judgment of the post-conviction court.

_____
JOHN EVERETT WILLIAMS, JUDGE